Anthony Argiropoulos, Esq.
Sheila Woolson, Esq.
Thomas Kane, Esq.
Maximilian Cadmus, Esq.
Lauren B. Cooper, Esq.
**BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ, PC**
281 Witherspoon Street
3rd Floor
Princeton, New Jersey 08540
Telephone: (609) 490-4860

*Attorneys for Wakefern Food Corp.*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| WAKEFERN FOOD CORP.,<br><br>Plaintiff,<br><br>v.<br><br>VILLAGE SUPER MARKET, INC., VSM NY HOLDINGS, LLC, and VSM GOURMET, LLC,<br><br>Defendants. | **COMPLAINT AND JURY DEMAND**<br><br>No. _____ |

Plaintiff Wakefern Food Corp. ("Plaintiff" or "Wakefern"), by and through its undersigned counsel, Baker, Donelson, Bearman, Caldwell & Berkowitz, PC, as to its Complaint against Defendants Village Super Market, Inc. ("Village" or "Defendant"), VSM NY Holdings, LLC ("VSM NY"), and VSM Gourmet, LLC ("VSM Gourmet") (collectively "Defendants"), alleges as follows:

**PRELIMINARY STATEMENT**

1.      Defendant Village Super Market, Inc. has perpetuated an ongoing scheme to steal and abuse federally registered marks of Plaintiff Wakefern Food Corp. This has occurred despite Village being a stockholder of Wakefern, and despite John J. Sumas, the CEO of Village, also sitting on Wakefern's Board of Directors.

2.      Village was caught red-handed infringing on Wakefern's *Fairway®*, and *Gourmet Garage®* marks when Village opened its Old Bridge, New Jersey store in March 2024. In response, Wakefern gave Village a temporary reprieve of one year so that Village could rectify its infringing activities without jeopardizing the opening of its new store.

3.      But instead of getting its house in order, Village used that year to greatly expand its infringing activities. It began using the *Fairway®*, and *Gourmet Garage®* marks in even more stores and on a variety of new products.

4.      Most disturbingly, when Wakefern discovered the extent of these new infringing activities in May 2025, an audit revealed that Village had improperly affixed the *Fairway®*, and *Gourmet Garage®* marks on a variety of mislabeled products.

**THE PARTIES**

5.      Wakefern is a company incorporated under the laws of New Jersey and owned by its members, with its principal place of business located in Keasbey, New Jersey.

6.      Village is a publicly traded company (Nasdaq: VLGEA) created under the laws of New Jersey with a principal place of business 733 Mountain Ave., Springfield, NJ 07081. Village is a stockholder of Wakefern Food Corp. John J. Sumas is the CEO of Village, a director on Village's Board of Directors, and one of the chief owners of Village stock.

7.      VSM NY is a company created under the laws of New York with a principal place of business at 733 Mountain Ave., Springfield, NJ 07081. According to Village's 2024 10-K Annual Report filed with the Securities and Exchange Commission, VSM NY is a wholly-owned subsidiary of Village. It is also a stockholder of Wakefern Food Corp. VSM NY has a limited license from Wakefern to operate certain approved grocery stores under Wakefern's *Fairway*® banner.

8.      VSM Gourmet is a company created under the laws of New York with a principal place of business at 733 Mountain Ave., Springfield, NJ 07081. According to Village's 2024 10-K Annual Report filed with the Securities and Exchange Commission, VSM Gourmet is a wholly-owned subsidiary of Village. It is also a stockholder of Wakefern Food Corp. VSM Gourmet has a limited license from Wakefern to operate certain approved grocery stores under Wakefern's *Gourmet Garage*® banner.

9.      VSM NY and VSM Gourmet are alter egos of Village. They are wholly-owned by Village. They are not marketed or presented to the public as separate entities from Village. They share common employees with Village. Their systems are integrated with Village's systems. They receive their instruction from Village. And they are treated as business units or departments of Village.

## JURISDICTION AND VENUE

10.      The claims for trademark infringement, unfair competition, false association, false endorsement, false designation or origin, trademark dilution, and false advertising, respectively, asserted under Counts I-III, *infra*, arise under the Trademark Act of 1946 (as amended; the "Lanham Act"); namely, 15 U.S.C. §§ 1051 *et seq*. Accordingly, this Court has original and subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1338(a), and 15 U.S.C. § 1121(a).

3

11. Wakefern does not bring any state common law claims, which are the subject of a separate lawsuit pending in New Jersey Superior Court between the parties.

12. A substantial part of the events giving rise to the claims asserted *infra* occurred in this judicial District. Therefore, venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2).

## FACTS COMMON TO ALL COUNTS

13. Wakefern is the largest retailer-owned grocery cooperative in the United States. It is comprised of roughly 43 families, who through their corporate designees are Wakefern's stockholders, also called "members," who independently own and operate retail supermarkets across the Eastern United States.

14. Wakefern is governed by a Board of Directors. All members of the Board are affiliated with a member of Wakefern.

15. Wakefern provides valuable services to its members, including, *inter alia*, bulk purchasing, warehousing, delivery of merchandise, development of private labels (like *Bowl & Basket®* and *Paperbird®*), marketing, and administrative functions. In return, members pay mark-ups on wholesale merchandise received, assessments, and other proportional financial contributions to support the cooperative.

### *Wakefern's Intellectual Property*

16. Wakefern owns a number of famous grocery brands, including *ShopRite®*, *Price Rite Marketplace®*, *Fairway®*, and *Gourmet Garage®*, among others. Wakefern licenses its intellectual property ("IP") to its members, permitting them to operate grocery stores under these banners.

17.     Below are examples of *ShopRite®* marks owned by Wakefern:

  

18.     Below is an example of the *Price Rite Marketplace®* mark owned by Wakefern:



19.     Below is an example of the *Fairway®* mark owned by Wakefern:



20.     Below is an example of the *Gourmet Garage®* mark owned by Wakefern:



5

21.     Because this intellectual property is among the cooperative's most valuable assets, Wakefern controls the use of these brands through its intellectual property licenses and related brand standards to ensure no member does anything to dilute, weaken, or tarnish them, thereby destroying the value of these brands for all members.

*The Wakefern IP Manual*

22.     All stockholders of Wakefern, including Village and VSM NY, are bound by the Wakefern Food Corp. Intellectual Property Manual ("IPM"). The IPM expressly dictates the appropriate use of Wakefern's IP, including the above-noted brands.

23.     Section VI(c)(7) of the IPM prohibits cross-branding of Wakefern's marks. "Cross-branding" occurs when two distinct Wakefern marks are used in combination with one-another. For example, selling *ShopRite®* brand product at a member's *Price Rite Marketplace®* store would constitute impermissible cross-branding. Cross-branding is prohibited because it can result in confusion, dilution, and ultimately damage to the value of Wakefern's distinctive marks.

24.     Section VI(J) of the IPM is titled "Products identified by Wakefern's IP." This section requires that a member wishing to sell new products bearing Wakefern IP, or obtain products bearing Wakefern IP from a new supplier, must obtain pre-approval from Wakefern's legal department in writing. The provision is repeated in full below:

> Except for commissary- and store- made items, members, subsidiaries and licensees shall purchase all goods bearing Wakefern's IP from Wakefern or from sources approved in writing by the Legal Department. If members, subsidiaries and licensees wish to engage new suppliers of such goods, they shall obtain the Legal Department's advance written approval of any new suppliers and of samples of the goods before they are offered for sale. All changes in the nature, character, composition or quality of such goods must be approved by the Legal Department before the changed goods are offered for sale to the public. Goods bearing a

6

member-owned brand or family name may not, however, also bear Wakefern's IP.

25.     Appendix III of the IPM is titled "Advance Written Approval of Use of Wakefern's IP—Who Approves What?" Here too, the IPM reiterates that "[p]urchasing from third-party suppliers private label goods bearing Wakefern's IP" requires prior written approval of the "Legal Dept."

26.     Finally, Section III of the IPM further provides that "[a]ny deviation from the IPM…must be approved in writing, in advance, by a member of the Legal Department." In fact, this requirement is so important that it is repeated on every single page of the IPM.

*The Intellectual Property License Agreement*

27.     Village and Wakefern are parties to a Trademark License Agreement, more commonly referred to as the Intellectual Property License Agreement ("IPLA"). The IPLA grants Village a "non-exclusive, non-assignable, not-transferable" license to use Wakefern's *ShopRite®* IP.

28.     Section 4 of the IPLA provides that Village may only use the *ShopRite®* IP in the form and manner "prescribed from time to time by Licensor [*i.e.*, Wakefern] in its Graphics Standards Manual, by order of the Trade Name and Trademark Committee or otherwise[.]" It also provides that Village is not permitted to use the *ShopRite®* IP "in connection with any other business or location or in combination with any other trademarks or service marks without prior written approval of Licensor."

29.     Section 7(b) of the IPLA gives Wakefern the right to terminate the IPLA if Village should "breach, violate or fail to perform or observe (i) any rules or regulations of Licensor [*i.e.*, Wakefern], (ii) any resolutions, past or future, of the Board of Directors of Licensor, or (iii) any of the covenants, terms or conditions of any agreements between Licensor and Licensee…and

Licensee shall fail to correct or take immediate action in good faith to correct such breach, violation or failure within ten (10) days following receipt of notice of the breach or violation[.]"

30.    Section 7(b) also gives Wakefern the right to terminate the IPLA if "Licensee shall engage in any unethical or illegal business practice tending to diminish the goodwill and the Marks[.]"

*The Fairway and Gourmet Garage Member Agreements*

31.    In addition to the IPM, Village's licenses to use the *Fairway*® and *Gourmet Garage*® marks are also governed by two intellectual property license agreements. These are the "Fairway Member Agreement" and "Gourmet Garage Member Agreement" (collectively, the "Member Agreements").

32.    The Fairway Member Agreement permits VSM NY, a subsidiary of Village, to use *Fairway*® IP at just five locations. These five locations, which are listed in Appendix B of the agreement, are as follows:

- 2131 Broadway, New York, NY 10023 ("Broadway Store");

- 550 2nd Avenue, New York, NY 10016 ("Kips Bay Store");

- 240 East 86th Street, New York, NY 10028 ("86th Street Store");

- 766 6th Avenue, New York, NY 10010 ("Chelsea Store"); and

- 847 Pelham Pkwy, Pelham Manor, NY 10803 ("Pelham Store").

33.    The Gourmet Garage Member Agreement likewise permits VSM Gourmet, another subsidiary of Village, to use *Gourmet Garage*® IP at three locations. These three locations are as follows:

- 366 Broadway, New York, NY 10013 ("Tribeca");

- 489 Broome St., New York, NY 10013 ("Soho"); and

8

- 155 W 66th St., New York, NY 10023 ("Lincoln Square").

34.   In both Member Agreements, VSM NY and VSM Gourmet acknowledge that Wakefern—not Village—is the sole owner of the *Fairway®* and *Gourmet Garage®* IP and all goodwill associated with the IP.

35.   In Section 2(b) of the Member Agreements, VSM NY and VSM Gourmet agree that it will not "directly or indirectly attack the title or any rights of Licensor [*i.e.*, Wakefern] in or to the Intellectual Property[.]"

36.   Section 3(d) of the Member Agreements incorporates the IPM by reference, and provides that VSM NY and VSM Gourmet must comply with all provisions of the IPM, as well as all other rules, policies, and procedures of Wakefern, which the Member Agreements define as the "Documents."

37.   Like the IPM, Section 3(e) the Member Agreements also provide that VSM NY and VSM Gourmet must obtain written pre-approval from Wakefern before offering new products for sale bearing Wakefern IP, or obtaining products bearing Wakefern IP from a new supplier. Specifically, Section 3(e) states the following:

> Licensee [*i.e.*, VSM NY and VSM Gourmet] shall purchase all goods bearing the Marks from Licensor [*i.e.*, Wakefern] or from sources approved in writing by Licensor. If Licensee wishes to engage new suppliers of such goods, Licensee shall obtain Licensor's advance written approval of any new suppliers and of samples of the goods before they are offered for sale. All changes in the nature, character, composition or quality of such goods must be approved by Licensor before the changed goods are offered for sale to the public.

38.   Section 4(e) of the Member Agreements prohibits cross-branding. Specifically, it prohibits Village from using the *Fairway®* and *Gourmet Garage®* marks "in combination with

9

any other trademarks, service marks or copyrightable subject matter without prior written approval of Licensor."

39.     Section 12(b)(i) of the Member Agreements gives Wakefern the right to terminate the Member Agreements,

> [i]f Licensee [*i.e.*, VSM NY and VSM Gourmet] breaches, violates or fails to perform or comply with (a) any rules or regulations of Licensor [*i.e.*, Wakefern], including any provision of the Documents [*i.e.*, the IPM and other Wakefern rules and policies], (b) any resolutions, past or future, of the Board of Directors of Licensor, (c) any order of the Trademark and Trade Name Committee, and/or (d) any of the covenants, terms or conditions of any agreements between Licensor and Licensee or between a subsidiary of Licensor and Licensee; and Licensee fails to correct or take immediate action in good faith to correct such breach, violation or failure within ten (10) days following receipt of written notice of the breach or violation from Licensor[.]

40.     Section 12(b)(i) also gives Wakefern the right to terminate the Member Agreements "if Licensee [*i.e.*, VSM NY or VSM Gourmet] engages in any unethical or illegal business practice tending to devalue, injure, tarnish or dilute the goodwill or reputation of Licensor [*i.e.*, Wakefern] and/or the Intellectual Property as determined by Licensor in its sole discretion[.]"

41.     Section 13 of the Member Agreements, titled "Noncompliance," gives Wakefern other enforcement mechanisms beyond termination. It states that "[i]f Licensee [*i.e.*, VSM NY or VSM Gourmet] fails to comply with this Agreement and/or the Documents [*i.e.*, the IPM and other Wakefern rules and policies], in addition to or instead of the rights granted to Licensor under Section 12 above, Licensor [*i.e.*, Wakefern] may deem Licensee ineligible to receive financial incentives from Licensor, to participate in lending programs offered by Licensor, and/or to apply to open additional Supermarkets.

42.     Finally, Section 4(c) of the Member Agreements addresses certifications of compliance. The paragraph provides:

> Licensee [*i.e.*, VSM NY or VSM Gourmet] hereby certifies that its use of Licensor's Intellectual Property in its existing business activities complies with this Agreement, all relevant laws, ordinances and regulations, and the Documents. Licensee shall make this certification in writing annually on the Stockholders' Questionnaire, and upon Licensor's reasonable request.

43.     The "Stockholder's Questionnaire" is an annual form filled out by each Member of Wakefern certifying their compliance with the cooperative's rules. The annual Stockholder Questionnaire requires each Member (including Village) to certify their compliance with the IPM, Member Agreements, and other IP obligations. The Stockholder's Questionnaire provides space for each Member to identify any "exceptional or unusual uses of Wakefern's intellectual property."

44.     Each year from 2019 to through 2025, Village, on behalf of itself and its subsidiaries, has certified that "[i]ts use of Wakefern's intellectual property" complies with all applicable Wakefern rules, policies, agreements, and resolutions. But Village's certifications were false. The Village Parties were concealing numerous serious intellectual property infringements.

<em>Village's IP Violations and Infringements</em>

45.     In March 2024, Village opened a newly renovated *Shoprite*® store in Old Bridge, New Jersey through its subsidiary Village Super Market of NJ, LP ("VSM NJ"). Just prior to opening, John J. Sumas and Nicholas Sumas II showed pictures and elevations of the store to Wakefern's President, Michael Stigers. Mr. Stigers noted several glaring infringements of the *Gourmet Garage*® and *Fairway*® marks.

46.     Among other things, the ShopRite at Old Bridge store featured a *Fairway®* artisanal cheese counter, olive bar, and coffee station. It also featured a *Gourmet Garage®* sandwich counter, soup bar, and salad bar.

47.     Neither Village, nor VSM NJ had a license to use the *Fairway®* or *Gourmet Garage®* marks at its ShopRite of Old Bridge store, or anywhere else in New Jersey. Thus its use of these marks at ShopRite of Old Bridge infringed on Wakefern's marks.

48.     Likewise, by using the *Fairway®*, and *Gourmet Garage®* brands in connection with the *ShopRite®* brand, Village and VSM NJ were engaging in cross-branding all three brands without prior written approval. Cross-branding is prohibited under the Member Agreements and IPM.

49.     *Figures 1-3* below are examples of Village's and VSM NJ's infringing uses of the *Fairway®*, and *Gourmet Garage®* marks at the ShopRite of Old Bridge store. They are all taken from customer photos posted to the ShopRite of Old Bridge store page on Google.[1]

---

[1]     Source: https://www.google.com/search?q=ShopRite+of+Old+Bridge#lpg=cid:CgIgAQ%3D%3D.



*Figure 1*



*Figure 2*

13



*Figure 3*

50.     Village and VSM NJ's executives (who are the same people) knew that they were using Wakefern's marks in unauthorized and infringing ways, but pressured Mr. Stigers and Wakefern staff not to disrupt the grand opening of the new Old Bridge store by requiring Village/VSM NJ to undo its violations.

51.     At Village/VSM NJ's insistence, on March 22, 2024, Wakefern entered into a letter amendment of the Member Agreements (the "Letter Amendment"). The Letter Amendment permitted Village/VSM NJ to use the *Gourmet Garage*® and *Fairway*® marks at the ShopRite of Old Bridge location only, as part of a one-year pilot program.

52.     The Letter Amendment granted a "one-time limited exemption" from the cross-branding prohibitions in the IPM to permit Village/VSM NJ to continue operating its infringing coffee bar, salad bar, sandwich counter, and a few other specifically identified infringing uses as part of a one-year pilot program.

14

53.     The Letter Amendment also provided that Village/VSM NJ "must seek advance written permission from Wakefern if it wishes to expand or modify" the limited exceptions granted in the Letter Amendment.

54.     Just prior to the expiration of the Letter Amendment, on March 11, 2025, Village's General Counsel, Daniel McCarthy, Esq., sent a written request that the Letter Amendment be extended for another year and expanded to cover Village/VSM NJ's soon-to-open new store, the ShopRite of Watchung in Watchung New Jersey.

55.     On March 26, 2025, Wakefern staff responded that Village's request would be presented to Wakefern's Trade Name & Trademark Committee for consideration. Wakefern staff requested that Village "delineate all the ways in which Village is using the marks in question, and sourcing and selling product that does not adhere to requirements."

56.     On April 7, 2025, Village's IP counsel, Metz, Lewis, Brodman, Must, and O'Keefe sent a four-page letter purporting to delineate all Village's current infringing uses. The letter admitted that VSM NJ had expanded its infringing uses far beyond the Letter Amendment.

57.     The letter admitted that Wakefern's *Gourmet Garage®* mark was being used in the following ways in addition to the limited exceptions granted in the Letter Amendment:

- On packaging for fresh fruits

- On packaging for vegetables

- On packaging for rice dishes

- On packaging for pasta dishes

- On packaging for soups

- On packaging for salads

- On packaging for dried fruits and nuts

15

- On packaging for fresh prepared meats, seafood and poultry

- On packaging for quiches and prepared breakfast items

- On packaging for fresh, prepared meals including protein, starch, pasta, vegetables or fruit

- On packaging for eggs

58.     The letter also confirmed that Wakefern's *Fairway*® mark was being used in the following unauthorized ways at the same ShopRite® stores:

- On packaging for pizza

- On packaging for ice cream

- On packaging for milk

- On packaging for olive oil and vinegar

- On packaging for dried fruits and nuts

- On packaging for maple syrup

- On packaging for spices

- On packaging for vitamins

- On packaging for soap

- On packaging for fresh fruits

- On packaging for fresh vegetables

- On packaging for rice dishes

- On packaging for soups

- On packaging for salads

- On packaging for dried fruits and nuts

- On packaging for fresh and prepared meats, seafood and poultry

- On packaging for juices

59. The April 7, 2025 letter also asserted that Village/VSM NJ intended to unilaterally expand its infringing uses "within a few weeks" to its newly-renovated ShopRite of Watchung store.

60. The April 7, 2025 letter proposed, among other things, that Wakefern should permanently assign ownership of the *Gourmet Garage*® mark to Village and give Village an exclusive, perpetual, transferable, sublicensable, right to the *Fairway*® mark. The letter requested that Village's proposal be presented to the Wakefern Trade Name & Trademark Committee on an expedited basis for "review and approval." The letter attached drafts of Village's proposed assignment and license agreements.

61. On April 15, 2025, Village's proposal was presented to the Wakefern Trade Name & Trademark Committee.

62. After reviewing the requests from Village and discussing the proposal, the Trade Name & Trademark Committee unanimously recommended that Village's proposal be rejected in its entirety and that Village and its subsidiaries be required to come into full compliance with their Member Agreements and the IPM.

63. At the April 17, 2025 meeting of the Wakefern Board of Directors, the Board voted to affirm the Trade Name & Trademark Committee's recommendation.

64. On April 18, 2025, the Board's decision was communicated to Village. The letter expressly informed Village that it "will be required to come into compliance with each of its existing IP License Agreements with Wakefern and related cooperative rules and requirements." The letter also stated that "Wakefern staff will be reaching out to discuss a path forward for bringing [Village] into compliance."

65.    But Village had no intention to bring itself into compliance.

66.    On April 29, 2025—just eleven days after the Board's final decision was communicated to Village—a social media influencer called "megthings_" posted multiple paid posts advertising the interior of Village's recently-opened Watchung Store.

67.    The influencer posts showed that Village/VSM NJ had expanded its infringing and unlicensed uses to its ShopRite of Watchung store, which was never part of the Letter Amendment:



*Figure 4 – Stills from April 29, 2025 video posted by megthings_ on Instagram[2]*

---

[2]    Source: https://www.instagram.com/reel/DJAUqbmvpBE/.

68.    Village's intentional and unauthorized misuse of Wakefern's marks has caused confusion in the relevant market. For example, the below January 17, 2026 post by paid influencer "megthings_" informs customers that the Old Bridge store is a "Fairway ShopRite":



*Figure 5 – Stills from January 17, 2026 post by megthings_ on TikTok[3]*

---

[3] Source: https://www.tiktok.com/@megthings_/video/759646248987399438.

69.     In light of Village's escalating abuses, on May 2, 2025, Wakefern's General Counsel notified Village that it was in breach of its Member Agreements and therefore ineligible to (a) receive financial incentives from Wakefern, (b) participate in lending programs offered by Wakefern, and/or (c) to apply to open additional Supermarkets.

70.     On May 15, 2025, counsel for Village sent a letter assuring Wakefern that Village "took immediate, comprehensive action" to cure the IP violations, and requesting that Wakefern revoke its prior notice of ineligibility. Village's CEO John J. Sumas texted photographs of Village staff tearing down and covering up infringing signage purportedly to show he was in earnest.

71.     In light of Village's representations, on May 16, 2025, Wakefern notified Village that, "in light of Village's efforts to come into compliance and on the condition that Village promptly comes into full compliance with the Member Agreements," Wakefern would once again deem Village eligible to apply for new grocery stores. Wakefern expressly reserved its contractual rights, and undertook a compliance and quality assurance audit to verify Village's representations.

*The Compliance and Quality Assurance Audit*

72.     An audit by Wakefern's own brand Quality Assurance ("QA") team revealed that Village is selling products under the *Fairway*® label that: (a) were not obtained through Wakefern; (b) were not obtained from Wakefern-approved suppliers; (c) were never pre-approved in writing by Wakefern; and, (d) did not undergo Wakefern's quality assurance and safety review.

73. Members of Wakefern's QA team visited Village's *Fairway®* locations and purchased a sampling of *Fairway®* branded products.

74. The results of the audit were concerning. The QA team found 26 products that did not comply with labeling requirements.

75. After the audit, the QA team recommended that 16 of the sampled products be subject to an immediate recall.

76. Village's conduct was not authorized by Section 3(e) of the *Fairway®* Member Agreement, which states "Licensee [*i.e.*, Village] shall purchase all goods bearing the Marks from Licensor [*i.e.*, Wakefern] or from sources approved in writing by Licensor. If Licensee wishes to engage new suppliers of such goods, Licensee shall obtain Licensor's advance written approval of any new suppliers and of samples of the goods before they are offered for sale."

77. It also was not authorized by Section VI(J) of the IPM which states that a member wishing to sell new products bearing Wakefern IP must obtain pre-approval from Wakefern's legal department in writing.

78. Village's conduct was also not authorized by Section 12(b)(i) of the *Fairway®* Member Agreement because sourcing product from unapproved suppliers, bypassing Wakefern's quality assurance standards, and violating FDA and USDA labeling laws tend "to devalue, injure, tarnish or dilute the goodwill or reputation" of Wakefern and Wakefern's *Fairway®* marks.

79. On August 4, 2025, Wakefern sent another notice to Village.

80. On August 13, 2025, Wakefern sent another letter directing Village to cease ordering unapproved *Fairway®* branded products and immediately provide Wakefern with a list of *Fairway®* branded products being sold by Village.

21

81.    Village waited until October 6, 2025 to disclose a list of the *Fairway®* and *Gourmet Garage®* products that it is selling in its stores.

82.    Notwithstanding the foregoing, Village continued to sell unapproved *Fairway®* and *Gourmet Garage®* products at unapproved locations. In November 2025, Wakefern discovered that *Gourmet Garage®* products were still being sold at unlicensed stores, and *Fairway®* products were still being sold at unlicensed stores.

*Village Secretly Bypassed the Product*
*Approval Process to Sell Unapproved Fairway® Products*

83.    Products sold under a Wakefern-owned label, like *Fairway®*, and *Gourmet Garage®*, among others, are referred to as "own brand" products.

84.    By contrast, products sourced by members that do not come from Wakefern and do not bear a Wakefern label are called "local DSD" products. DSD stands for "direct store delivery." For example, a Wakefern member may choose to independently source fresh bakery items from a well-known local baker for sale in the member's stores. These would be "local DSD" products.

85.    The process for enrolling local DSD products is very different from the process for approving own brand products. Unlike local DSD products, all own brand products must be subjected to Wakefern's QA standards and strict approval requirements as set out in the IPM and member Agreements.

86.    Village bypassed the rigorous own brands approval process by enrolling over 400 *Fairway®* items as "local DSD" products.

87.    But that is not all, Village used shell companies to hide its infringing and breaching conduct from Wakefern.

22

88.     For example, in 2023, a woman named Tatiana Boncompagni filed a third-party complaint against Village and its CEO, John J. Sumas in New York Supreme Court. The matter is captioned *Fire Brands Innovation, LLC v. Boncampagni, et als.*, Index No.: 655604/2023 ("Fire Brands Suit").

89.     In the Fire Brands Suit, Ms. Boncompagni alleges she was hired by John J. Sumas and Village to be a "brand ambassador" for the *Fairway®* supermarkets in New York City. The publicly filed third-party complaint includes a text message sent by John J. Sumas discussing the "impact" Ms. Boncompagni would have on the *Fairway®* and *Gourmet Garage®* brands:

> Yes thanks. It was great having you down and meeting Laura. You two are our core customer, we need your input and energy. Hopefully you were able to get a larger appreciation of your new village family. Love to see the impact you can have on fairway and Gourmet Garage. And I'll talk to Dan about finishing the docs

*Figure 6*

90.     Ms. Boncompagni alleges that she was surprised to find that the agreements prepared by Village's attorneys listed Firebrands Innovation LLC ("Fire Brands") as the contracting party, rather than Village. Ms. Boncompagni alleges that Village and John J. Sumas used Fire Brands to hide Village's investments from Wakefern.

91.     The publicly-filed third-party complaint includes a screenshot of a text message in which John J. Sumas was explicit about his intention to hide his activities surrounding Wakefern's IP from Wakefern:

As a member of the Wakefern Consortium Village was apparently concerned about Wakefern being alerted to their investment in Eat Sunny and for this reason invested in the company through their "Fire Brands" arm and did not, for example, issue a press release regarding their investment into the company. Again, and this time explicitly for this reason, they did not want to become a signatory as an official client of the PR firm, even though the original idea was that this firm would represent both Fairway and Eat Sunny.

Seems like text isn't best way to explain this but who ever signs the contract vets it. And then the other party reimburses that signor the 4K a month. If village signs the contract we are legally the client. It might create issues with wakefern where they might say as their partner they won't allow us to do X. But if you sign there isn't anyone that can stop you from doing whatever you want with Jaret. I'm not looking for reimbursement for venting contract

*Figure 7*

92.     Ms. Boncompagni's third-party complaint alleges the business relationship between John J. Sumas and Ms. Boncompagni fell apart after Ms. Boncompagni rejected John J. Sumas' romantic advances. According to the Fire Brands Suit, John J. Sumas responded by attempting to destroy Boncompagni's personal and professional reputation by filing a complaint loaded with accusations of unethical conduct, and sending copies to tabloid magazines.

*93.*     But that is not the only sham company used by Village. Wakefern's QA audit also uncovered other products sold under the *Fairway*® banner without prior approval.

94.     The packaging for these products lists the distributor as "*Fairway* Group Central Services LLC." This is not a Wakefern company, and should not have Wakefern's *Fairway*® brand in its name. Nor is this company listed as a subsidiary of Village in Village's 10-K Annual Report filed with the SEC.

95.     According to the New York Department of State Division of Corporations, this entity has not submitted its required Biennial Statement since 2013, more than 12 years ago.

96.     The concealment of Village's IP violations at Village's Old Bridge and Watchung stores, bypassing the rigorous own brand approval process for *Fairway®* products,  using shell companies like Fire Brands to hide its IP violations from Wakefern, and Village's mysterious and infringing use of "*Fairway* Group Central Services LLC" as a supplier, these are all part of a pattern of concealed abuses by Village, its subsidiaries, and its executives.

*Neither Village Nor VSM NY Obtained the Written Pre-Approval from*
*Wakefern's Legal Department to Source and Sell New Fairway®-Branded Items*

97.     On October 6, 2025, Village's General Counsel, Daniel McCarthy contended that "some time in and around the spring of 2021" two Village employees (Patrick Sheils and John J. Sumas) invited Chris Skyers (a former Wakefern employee) to do a "walk-through" of Village's *Fairway®* store at 74th Street in Manhattan. According to Village, Mr. Skyers agreed that Village could carry those items.

98.     This is not what the IPM and *Fairway®* Member Agreement require. Village and VSM NY were required to obtain written pre-approval from Wakefern's Legal Department prior to selling any *Fairway®*-branded product. This approval would only be given following a rigorous review of the proposed products.

99.     Mr. Skyers' alleged "walk-through" of a store does not satisfy the requirement for written pre-approval. Likewise, Mr. Skyers, who left Wakefern in 2022, was not a member of the Wakefern Legal Department.

100.     Further, Mr. Skyers was not even employed by Wakefern when Village (and its subsidiaries) started selling some of the unapproved products under Wakefern's labels.

25

101. Finally, any deviation from the IPM's requirements must likewise be "approved in writing, in advance, by a member of the Legal Department."

102. In short, Village and VSM NY were not authorized to sell *Fairway*® branded product.

**COUNT I**
**Trademark Infringement Under Section 32(1)**
**of the Lanham Act, 15 U.S.C. § 1113(1)**
**(Infringement of Federally Registered *Fairway*®, and *Gourmet Garage*® Marks)**

103. Plaintiff repeats and incorporates by reference all allegations in Paragraphs 1 to 102 of this Complaint as if set forth in full.

104. Plaintiff is the exclusive owner of the federally registered *Fairway*® and *Gourmet Garage*® marks.

105. Plaintiff has the exclusive right to use each of the *Fairway*® and *Gourmet Garage*® marks in United States commerce for, *inter alia*, advertising, promoting, offering for sale, and selling food products.

106. Plaintiff's exclusive rights in and to each of the *Fairway*® and *Gourmet Garage*® marks predate any rights that Defendant could establish in and to any mark that consists of *Fairway*® or *Gourmet Garage*® in whole and/or in part.

107. Both of the *Fairway*® and *Gourmet Garage*® marks are fanciful and/or arbitrary when used for food products and, therefore, are inherently distinctive.

108. Both of the *Fairway*® and *Gourmet Garage*® marks identify Plaintiff as the exclusive source of products offered under the *Fairway*® and *Gourmet Garage*® marks and, therefore, have acquired distinctiveness.

109. Defendant is using, and intends to continue to use, the *Fairway*® and *Gourmet Garage*® marks in commerce to advertise, promote, offer for sale, and sell food products.

26

110.    Defendant's use of the *Fairway®* and *Gourmet Garage®* marks in commerce on, for, and/or in connection with the advertising, promotion, offering for sale, and/or sale of food products, as alleged herein, is causing, and is likely to continue causing, consumer confusion, mistake, and/or deception about whether Defendant is a licensee, authorized distributor, and/or affiliate of products that Plaintiff offers under its *Fairway®* and *Gourmet Garage®* marks, including, without limitation, food products.

111.    Defendant's use of the *Fairway®* and *Gourmet Garage®* marks, in commerce on, for, and/or in connection with the advertising, promotion, offering for sale, and/or sale of food products, as alleged herein, is causing, and is likely to continue causing, consumer confusion, mistake, and/or deception about whether Defendant and/or Defendant's products are affiliated, connected, and/or associated with products that Plaintiff offers under its *Fairway®* and *Gourmet Garage®* marks, including, without limitation, food products.

112.    Defendant's use of the *Fairway®* and *Gourmet Garage®* marks, in commerce on, for, and/or in connection with the advertising, promotion, offering for sale, and/or sale of food products, as alleged herein, is causing, and is likely to continue causing, consumer confusion, mistake, and/or deception about whether Defendant and/or Defendant's products originate with, and/or are sponsored or approved by, and/or offered under a license from, Plaintiff or vice versa.

113.    Plaintiff did not and does not consent to the misuse of its *Fairway®* and *Gourmet Garage®* marks by Defendant in the ways set forth above.

114.    Defendant had actual and constructive knowledge of Plaintiff's superior rights in and to the *Fairway®* and *Gourmet Garage®* marks when Defendant began using the *Fairway®* and *Gourmet Garage®* marks as part of its bad-faith scheme to confuse and deceive consumers, as alleged herein.

115.    Upon information and belief, Defendant adopted and uses the *Fairway*® and *Gourmet Garage*® marks in furtherance of Defendant's willful, deliberate, and bad-faith scheme of exploiting the extensive consumer goodwill, reputation, fame, and commercial success of products that Plaintiff offers under its *Fairway*® and *Gourmet Garage*® marks, including, without limitation, food products.

116.    Upon information and belief, Defendant has made, and will continue to make, substantial profits and gain from its unauthorized use of Plaintiff's *Fairway*® and *Gourmet Garage*® marks, to which Defendant is not entitled at law or in equity.

117.    Upon information and belief, Defendant's acts and conduct complained of herein constitute trademark infringement in violation of 15 U.S.C. § 1114(a).

118.    Plaintiff has suffered, and will continue to suffer, irreparable harm from Defendant's acts and conduct complained of herein, unless restrained by law.

119.    Plaintiff has no adequate remedy at law.

**COUNT II**
**Unfair Competition, False Endorsement, False Association, and False Designation of Origin Under Section 43(a)(1)(A) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A)**
**(Use of the *Fairway*®, and *Gourmet Garage*® Marks)**

120.    Plaintiff repeats and incorporates by reference all allegations in Paragraphs 1 to 119 of this Complaint as if set forth in full.

121.    Defendant's acts and conduct complained of herein constitute unfair competition, false endorsement, false association, and/or false designation of origin in violation of 15 U.S.C. § 1125(a)(1)(A).

122.    Defendant's use of the *Fairway*®, and *Gourmet Garage*® marks to advertise, market, offer for sale, and/or sell purported *Fairway*®, and *Gourmet Garage*® food products to consumers also constitutes unfair competition in violation of 15 U.S.C. § 1125(a)(1)(A).

28

123.    Defendants have also falsely held themselves out to be authorized to sell numerous *Fairway®*, and *Gourmet Garage®* food products that they were in fact not authorized to sell.

124.    Plaintiff has suffered, and will continue to suffer, irreparable harm from Defendant's acts and conduct complained of herein, unless restrained by law.

125.    Plaintiff has no adequate remedy at law.

**COUNT III**
**Trademark Dilution Under Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c)**
**(Dilution of the *Fairway®* and *Gourmet Garage®* Marks)**

126.    Plaintiff repeats and incorporates by reference all allegations in Paragraphs 1 to 125 of this Complaint as if set forth in full.

127.    Plaintiff's *Fairway®*, and *Gourmet Garage®* marks were famous and had value before Defendants began using these marks in commerce on, for, and/or in connection with the advertising, promotion, offering for sale, and/or sale of food products.

128.    The marks themselves and all the goodwill associated with these marks belongs to Wakefern, not Village.

129.    Defendants' use of Plaintiff's *Fairway®*, and *Gourmet Garage®* marks in commerce on, for and/or in connection with the advertising, promotion, offering for sale, and/or sale of food products is likely to dilute the distinctive quality of the *Fairway®*, and *Gourmet Garage®* marks.

130.    Defendants' use of Plaintiff's *Fairway®*, and *Gourmet Garage®* marks in commerce on, for and/or in connection with the advertising, promotion, offering for sale, and/or sale of food products is likely to dilute the distinctive quality of the *Fairway®*, and *Gourmet Garage®* marks, such that the marks' ability to identify Plaintiff, and Plaintiff's authorized users

29

of those marks, as the exclusive source of products offered under the *Fairway®*, and *Gourmet Garage®* marks will be whittled away.

131.    Defendants' use of Plaintiff's *Fairway®*, and *Gourmet Garage®* marks in commerce on, for and/or in connection with the advertising, promotion, offering for sale, and/or sale of food products is likely to dilute the distinctive quality of the *Fairway®*, and *Gourmet Garage®* marks, such that the marks' ability to indicate the distinctive quality of food products offered under such marks will be whittled away.

132.    Defendants' acts and conduct complained of herein constitute trademark dilution in violation of 15 U.S.C. § 1125(c).

133.     Plaintiff has suffered, and will continue to suffer, irreparable harm from Defendants' acts and conduct complained of herein, unless restrained by law.

134.    Plaintiff has no adequate remedy at law.

WHEREFORE, based on Defendants' conduct complained of herein, Plaintiff asks that this Court:

A.    Enter an order, finding in Plaintiffs' favor on each Count asserted herein;

B.    Pursuant to 15 U.S.C. § 1116:

1.    Preliminarily and permanently enjoining Defendants, their agents, servants, employees, officers, and all persons and entities in active concert and participation with them from using the *Fairway®*, and *Gourmet Garage®* marks (or any other mark(s) confusingly similar thereto) for, on, or in connection with the manufacture, distribution, advertising, promoting, offering for sale, and/or sale of any goods or services,

30

including, without limitation, *Fairway*®, and *Gourmet Garage*® food products without express written authorization from Wakefern;

2. Preliminarily and permanently enjoining Defendants, their agents, servants, employees, officers and all persons and entities in active concert and participation with them from falsely representing themselves as being a distributor, authorized retailer, and/or licensee of Plaintiff and/or any of Plaintiff's products (including, without limitation, Plaintiff's *Fairway*®, and *Gourmet Garage*® food products) without express written authorization from Wakefern;

3. Ordering Defendants to file with the Court and serve upon Plaintiff's counsel, within 30 days after service of the order of injunction, a report in writing under oath setting forth in detail the manner and form in which Defendant has complied with the injunction;

C. Pursuant to 15 U.S.C. § 1117:

1. Order Defendants to provide Plaintiff with a full accounting of all manufacture, distribution and sale of food products under the *Fairway*®, and *Gourmet Garage*® marks, as well as all profits derived therefrom;

2. Order Defendants pay Plaintiff all of Defendants' profits derived from the sale of infringing food products offered under the *Fairway*®, and *Gourmet Garage*® marks;

3. Award Plaintiff treble actual damages in connection with Defendants' infringement of the *Fairway*®, and *Gourmet Garage*® marks;

4.      Find that Defendants' acts and conducts complained of herein render this case "exceptional"; and

5.      Award Plaintiff its costs and reasonable attorneys' fees incurred in this matter;

D.      Pursuant to 15 U.S.C. § 1118, order the destruction of all unauthorized food products within the possession, custody, and control of Defendants that bear, feature, and/or contain any copy or colorable imitation of Plaintiff's *Fairway®*, and *Gourmet Garage®* marks;

E.      Award Plaintiff pre-judgment and post-judgment interest against Defendants;

F.      Award Plaintiff such other relief that the Court deems just and equitable.


Dated:  March 20, 2026            By:    *s/ Anthony Argiropoulos*
                                         Anthony Argiropoulos, Esq.
                                         Sheila Woolson, Esq.
                                         Thomas Kane, Esq.
                                         Maximilian Cadmus, Esq.
                                         Lauren B. Cooper, Esq.
                                         **BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWITZ, PC**
                                         281 Witherspoon Street, 3rd Floor
                                         Princeton, New Jersey 08540
                                         Telephone: (609) 490-4860

                                         *Attorneys for Plaintiff Wakefern Food Corp.*

## JURY DEMAND

Plaintiff Wakefern Food Corp. demands a trial by jury on all issues so triable.

Dated:  March 20, 2026               By:  _s/ Anthony Argiropoulos_
                                              Anthony Argiropoulos, Esq.
                                              Sheila Woolson, Esq.
                                              Thomas Kane, Esq.
                                              Maximilian Cadmus, Esq.
                                              Lauren B. Cooper, Esq.
**BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWITZ, PC**
281 Witherspoon Street, 3rd Floor
Princeton, New Jersey 08540
Telephone: (609) 490-4860

*Attorneys for Plaintiff Wakefern Food Corp.*

33

## <u>LOCAL CIVIL RULE 11.2 CERTIFICATION</u>

Pursuant to Local Civil Rule 11.2 of the United States District Court for the District of New Jersey, I hereby certify that the matter in controversy is related to the following pending action: *Village Super Market, Inc. v. Wakefern Food Corp., et al.*, Superior Court of New Jersey, Law Division, Middlesex County, No. MID-L-000450-26.

Dated:  March 20, 2026

By:  *s/ Anthony Argiropoulos*
Anthony Argiropoulos, Esq.
Sheila Woolson, Esq.
Thomas Kane, Esq.
Maximilian Cadmus, Esq.
Lauren B. Cooper, Esq.
**BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWITZ, PC**
281 Witherspoon Street, 3rd Floor
Princeton, New Jersey 08540
Telephone: (609) 490-4860

*Attorneys for Plaintiff Wakefern Food Corp.*

## LOCAL CIVIL RULE 201.1(d)(2) CERTIFICATION

Pursuant to Local Civil Rule 201.1(d)(2) of the United States District Court for the District of New Jersey, I hereby certify that the damages in this matter exceed $150,000, exclusive of interest, costs, and punitive damages, and is therefore excluded from compulsory arbitration.

I certify that the foregoing statements made by me are true.  I am aware that if any of the above statements made by me are willfully false, I am subject to punishment.

Dated:  March 20, 2026         By:   *s/ Anthony Argiropoulos*
Anthony Argiropoulos, Esq.
Sheila Woolson, Esq.
Thomas Kane, Esq.
Maximilian Cadmus, Esq.
Lauren B. Cooper, Esq.
**BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWITZ, PC**
281 Witherspoon Street, 3rd Floor
Princeton, New Jersey 08540
Telephone: (609) 490-4860

*Attorneys for Plaintiff Wakefern Food Corp.*

35